IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRUBAKER KITCHENS, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | No. 05-6756 |
| | : | |
| STEPHEN M. BROWN, et al. | : | |

**MEMORANDUM AND ORDER**

**Juan R. Sánchez, J.**                                                                                        May 3, 2006

Defendants Stephen Brown and Dean Gochnauer, the founders and principals of Ivy Creek Custom Cabinetry, Inc., move to quash a subpoena served on Ivy Creek's bank, arguing compliance will result in the disclosure of trade secrets contained in the company's business plan. I will deny the motion to quash because the sections of the plan movants seek to protect do not contain trade secrets.

**BACKGROUND**

Ivy Creek obtained a Small Business Administration loan from York Traditions Bank, which required Brown and Gochnauer to furnish a copy of Ivy Creek's business plan to the bank's lending department.

On February 23, 2006, Plaintiff Brubaker Kitchens, Inc. subpoenaed "all documents of, from, concerning or pertaining to" Ivy Creek and the four named Defendants from York Traditions Bank. Brown, Gochnauer, and Ivy Creek moved to quash the subpoena to prevent release of the bank's copy of the business plan. I subsequently ordered Brown and Gochnauer to produce the plan for an *in camera* inspection, and, in their correspondence to the Court, movants request the subpoena be

1

quashed with respect to the following portions of the plan:

>   (1)   Section 4 ("Services") - introductory paragraph, 4.1, 4.2, 4.3 (last four sentences);
>
>   (2)   Section 5 ("The Industry, Competition, and Market") - 5.3, 5.5;
>
>   (3)   Section 6 ("Marketing Plan") - in its entirety; and
>
>   (4)   Section 9 ("Goals and Strategies") - introductory paragraph, 9.2, 9.3.

**DISCUSSION**

A district court is permitted to quash or modify a subpoena if compliance would result in the disclosure of trade secrets. Fed. R. Civ. P. 45(c)(3)(B)(i). Pennsylvania law, which governs the analysis here, defines a "trade secret" as:

> information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
>
>   (1)   Derives independent economic value, actual or potential, from not being generally known to, and not begin readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
>   (2)   Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. C.S. § 5302. "The crucial indicia for determining whether certain information constitutes a trade secret are substantial secrecy and competitive value to the owner." *O.D. Anderson, Inc. v. Cricks*, 815 A.2d 1063, 1070 (Pa. Super. Ct. 2003). A court may also consider:

> (1) the extent to which the information is known outside the owner's business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly

acquired by others.

*Omicron Sys., Inc. v. Weiner*, 860 A.2d 554, 562 (Pa. Super. Ct. 2004).  Pennsylvania law places the burden on the party seeking protection to establish the existence of a trade secret.  *Christopher M's Hand Poured Fudge, Inc. v. Hennon*, 699 A.2d 1272, 1275 (Pa. Super. Ct. 1997) (citing *Gilbert v. Otterson*, 550 A.2d 550, 555 (Pa. Super. Ct. 1988)).

Upon consideration of these factors, the services described in Section 4 cannot logically be protected as trade secrets because their competitive value depends on disclosure, not only to those outside of Ivy Creek's business (*i.e.*, established cabinet dealers), but also to company employees who are involved in marketing Ivy Creek's cabinets.  For example, in the introductory paragraph, Brown and Gochnauer assert that Ivy Creek's "order reservation program" will substantially reduce the period to deliver finished cabinetry to a customer because established dealers will be permitted to reserve manufacturing time prior to submitting a finalized order.  The "order reservation program" only works, though, if it is disclosed to dealers and company employees.  The same is true of Ivy Creek's limited-lifetime warranty (section 4.1) and its "make after" policy (section 4.2). Additionally, nowhere in the plan does it state that Ivy Creek will require its dealers and customers to sign confidentiality agreements after these programs are marketed to them, leading me to conclude Ivy Creek has not taken measures to guard the secrecy of this information.[1]  Finally, the fifty-dollar dinner credit Ivy Creek offers to its customers (as set forth in section 4.3) should not be protected as a trade secret because its competitive value is negligible when compared to the cost of high-end custom cabinetry.

---

[1] The business plan itself is designated "confidential," but, as previously stated, nowhere in the plan is it suggested that Ivy Creek will implement measures to ensure certain information remains secret.

Paragraphs 5.3 ("Market Size") and 5.5 ("Customer Profile") describe Ivy Creek's target markets and target customer base, respectively, and movants contend this information is at the "core" of the company's business and "unknown to Ivy Creek's competitors." Customer lists and market data may be protected as trade secrets, but not "if they are easily or readily obtained without great difficulty through some independent source . . . [such as] trade journals, ordinary telephone listings, or an employee's general knowledge of who, in an established industry, is a potential customer for a given product." *Pestco, Inc. v. Assoc. Prods., Inc.*, 880 A.2d 700, 707 (Pa. Super. Ct. 2005). For this reason alone, the information in paragraph 5.3 about Ivy Creek's target markets cannot be classified as a trade secret because the plan states the data comes directly from Builder Magazine – a trade journal that is accessible to Ivy Creek's competitors. Additionally, paragraph 5.5 explains that Ivy Creek plans to solicit "empty nest" homeowners in affluent neighborhoods who wish to remodel their kitchens. This assertion is not entitled to protection as a trade secret because it merely reflects Brown's and Gochnauer's collective knowledge of who is a potential customer of high-end custom cabinetry.

Moreover, "to be classified as a trade secret, information must be an employer's actual secret and not comprise mere 'general trade practices.'" *Iron Age Corp. v. Dvorak*, 880 A.2d 657, 664 (Pa. Super. Ct. 2005) (citing *Felmee v. Lockett*, 351 A.2d 273 (Pa. 1976)). Based on this requirement, no part of Section 6 – the "heart" of the marketing plan – deserves protection as a trade secret. Specifically, Section 6 states that Ivy Creek will create a brochure and website, listen to customer needs, price its cabinets "in line" with its competitors, pay "typical" commissions to its dealers, provide samples to established dealers, and solicit feedback. These are not marketing methods or techniques that are of "peculiar importance" to Ivy Creek, *id.*; instead, the very words used to

describe them reveal Ivy Creek's marketing strategies consist entirely of "general trade practices."

Movants have also failed to persuade me the information in Section 9 should be protected from disclosure. The introductory paragraph does no more than inform the reader that Ivy Creek has "commitments" to meet sales goals for at least the next two years. The volume of sales is likely known by some employees other than Brown and Gochnauer, and the general assertion that Ivy Creek has attained its sales goals lacks meaningful competitive value. As such, the information in the introductory paragraph does not qualify as a trade secret. Paragraph 9.2 ("Keys to Success") fares no better because it simply summarizes Brown's and Gochnauer's industry connections, describes these contacts as the "primary assets of the company," and touts the company's inherent flexibility from having two experienced managers. No protection is warranted for this paragraph because Pennsylvania law does not regard a person's experience or subjective knowledge of an industry as a trade secret. *Iron Age Corp.*, 880 A.2d at 663 (citing *Hennon*, 699 A.2d at 1275). In paragraph 9.3, Brown and Gochnauer state that Ivy Creek "may explore aligning with a distribution company in years to come." This is a potentiality; not a program, method, or process by which Ivy Creek obtains customers or does business. *See Omicron Sys., Inc.*, 860 A.2d at 563-64. Moreover, use of the words "may explore" suggests Brown and Gochnauer have not made a substantial investment of time and financial resources in this project, rendering trade secret status inapposite here.

Therefore, I hold there are no trade secrets in the portions of the plan movants have sought to protect, and, accordingly, enter the following:

**ORDER**

AND NOW, this 3rd day of May, 2006, Defendants' Motion to Quash the Subpoena of

Brubaker Kitchens, Inc. (Document 34) is DENIED.

                                                                BY THE COURT:


                                                         /s/ Juan R. Sánchez
                                                           Juan R. Sánchez, J.